FILED

JUL 2 0 2006

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD RAYMOND MARTINEZ,<br><br>Plaintiff,<br><br>v.<br><br>JEANNE S. WOODFORD; et al.,<br><br>Defendants.<br>_____ / | No. C 05-1150 MHP (pr)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

This case is now before the court for consideration of defendants' motion for summary judgment. The parties' briefs and evidence on the motion show a difference of opinion as to the best course of medical treatment for plaintiff's chronic back problems. That difference of opinion does not, as a matter of law, amount to deliberate indifference to a medical need in violation of the constitutional ban on cruel and unusual punishment. Accordingly, summary judgment will be granted in the defendants' favor.

## BACKGROUND

Edward Martinez, a prisoner at the Correctional Training Facility ("CTF") in Soledad, filed this pro se civil rights action under 42 U.S.C. § 1983. In his complaint, Martinez alleged that several doctors at CTF were deliberately indifferent to his chronic back problems.

The following facts are undisputed unless noted otherwise.

Martinez has experienced back pain since at least March 2000. According to Martinez, the pain originally was occasional, but eventually became constant pain, and now includes pain and tingling in his right leg and foot as well as the pain in his back. He also has lumps on his lower back. Martinez states that the pain interrupts his sleep and interferes with his ability "to properly exercise." Martinez Affidavit, ¶ 1. He has seen several doctors for complaints of lower back pain and the lumps since his arrival at the CTF in about July 2002.

On April 2, 2003, Martinez was examined by Dr. Aung. Dr. Aung stated that Martinez had no serious problem with his back "although he could not explain the numbness and pain in [his] leg." Id. at ¶ 3. Dr. Aung prescribed Tylenol for the pain. The physician's progress notes for this date state that the inmate had "full flexion; can touch toes." Friedman Decl. Exh. A., p. 34.

On May 14, 2003, Martinez was seen by Dr. Aung after he filed an inmate grievance. Dr. Aung repeated that Martinez had no serious problem with his back but was unable to explain the numbness and pain in his leg. Dr. Aung again prescribed Tylenol for the pain and ordered x-rays. Dr. Aung had Dr. Luca look at the lumps on Martinez's back; one of the doctors told him the knots on his back were normal. The progress notes for that day indicate that the lumps were identified as "possible benign soft tissue swelling, ? fibrolipoma, ? synovial origin." Id. at 30. The findings and impressions were explained to the patient, who "did not agree, became confrontational, upset and threatened to file charges." Id.

On May 19, 2003, x-rays were taken of Martinez's back. These x-rays showed no evidence of scoliosis or degenerative disease, even though such evidence existed on x-rays taken three years earlier on June 21, 2000. The 2003 x-ray report stated:

> The vertebrae are normally developed and in normal alignment. There is no evidence of any acute injury. No intrinsic bone or joint pathology is seen. The invertebral disc spaces are well maintained. IMPRESSION: The lumbar spine and pelvis are within normal limits. No previous films are available for comparison.

Plaintiff's Opposition, Exh. B. By contrast, the 2000 x-ray report (done while he was at another prison) stated:

> The exam demonstrates mild scoliosis of the lumbosacral juncture, concavity to the right. The bones and joints are intact. A note is made of mild degenerative changes in the lower thoracic region as well as in the lumbosacral spine. The invertebral disc spaces are preserved. IMPRESSION: Minimal degenerative disease of the lumbosacral spine.

Plaintiff's Opposition, Exh. A. The reports thus disagreed as to whether there was (a) mild or no scoliosis and (b) minimal or no degenerative disease.

On July 14, 2003, Dr. Friederichs examined Martinez in connection with the second level of review of an inmate appeal Martinez had filed. Dr. Friederichs advised Martinez that "he would not do an MRI unless he was going to operate on [Martinez] and since he was not, there was no need for an MRI." Martinez Affidavit, ¶ 8. Dr. Friederichs prescribed Naprosyn and back exercises. Dr. Friederichs' progress notes stated under the "A/P" (analysis/plan) sections: A: Sciatica vs. lat femoral cutaneous neuropathy. P: Pt. reassured MRI not indicated @ this time. Emphasized exercises. Consider NCS if sx's persist." Friedman Decl. Exh. A., p. 30.

On the written reply to Martinez's appeal, Dr. Friederichs' response was that "'if symptoms persist or worsen a request for diagnostic testing (nerve conduction studies) would be considered. . . . Neither MRI nor referral to a speciality physician were indicated at this time.'" Martinez Affidavit, ¶ 9.

On December 8, 2003, Martinez was seen by Dr. Dayalan. Dr. Dayalan told Martinez he had a fat tumor and continued Dr. Friederichs' prescription for pain medication. Dr. Dayalan did not order nerve conduction studies. Dr. Dayalan's progress notes for that date noted that there was "no neurological – not much disability noted." Friedman Decl., Exh. A, p. 29. The observation portion of the notes also stated that there was no tenderness on the spine, no deformity, and no muscle weakness.

On January 12, 2004, Martinez was seen by Dr. Rosenthal, who said he was a back specialist. He prescribed Elavil, but did not inform Martinez of any risks or potential side effects of the medication. Martinez researched Elavil, found information that its side effects included hallucinations and seizures, and decided not to take it because he did not like the potential side effects.

3

On February 19, 2004, Martinez returned to Dr. Rosenthal and told him he had not taken the Elavil. He told Dr. Rosenthal that he had received massages that provided temporary relief. Martinez told Dr. Rosenthal he needed to see Dr. Friederichs to get the tests he believed Dr. Friederichs ordered. Dr. Rosenthal "was angry and said, 'you don't want medical attention, go get some massages.'" Martinez Affidavit, ¶ 13. Dr. Rosenthal's progress notes for that visit reflected that the inmate told him he did not take the Elavil and that massages by other inmates made his back feel fine. Dr. Rosenthal wrote, "He understood that I would not give him medicine for nerve root irritation (neuropathic pain) because all had drowsiness side effects. He said he was fine not taking any of the meds and left office." Friedman Decl., Exh. A, p. 27.

On May 10, 2004, Martinez was interviewed by Dr. Dayalan for another inmate appeal he had filed. Dr. Dayalan did not order any testing and didn't provide any new treatment for his pain. Dr. Dayalan's progress notes for the meeting indicate that it was an inmate appeal and that the patient wanted nerve conduction studies and an MRI that had been denied. The A/P section of the notes stated "A: No neuro object. P: No nerve conduction studies needed at this time. Return PRN." Id. at 26.

On June 4, 2004, Martinez was interviewed by Dr. Dinh for the second level of review of his inmate appeal. Dr. Dinh stated that the knots on Martinez's back were part of his bone structure, prescribed back exercises, cautioned him not to hurt his back, and prescribed Motrin. Dr. Dinh told Martinez that Motrin could cause ulcers and stomach bleeding and that he would prescribe omperazole to prevent those side effects, but did not order that medicine. Dr. Dinh denied Martinez's request for an extra mattress for his bunk. Dr. Dinh's progress notes for that date stated the following under the analysis and plan sections: "R lateral femoral [illegible] neuropathy, which as was noted earlier in another clinic visit. Informed pt. usually no testing for this condition. Chronic LBP - uncomplicated. No further testing necessary." Id. at 25. Dr. Dinh also wrote that he provided information about the use of NSAIDs and their side-effects, and for patient to use them only sparingly. Id.

On April 5, 2005, a medical review committee, consisting of five of the doctors who

4

treated Martinez, was held. See id. at 19-20. Dr. Luca's notes state that the committee decided that a psychology consult was needed in light of Martinez's anxiety and somatisations. Only one doctor voted for an MRI of the lumbar spine, and "this study was suggested just to alleviate the patient's worry." Id. at 20. All doctors were in agreement regarding the present diagnosis. Dr. Luca's notes, apparently made on the same date but before the committee meeting, also stated his impressions that the lumps were fibro-lipomas or synovial cysts "of no clinical significance." Id. at 10. Dr. Luca also noted that the back pain and lumps presented "no real findings to require a 2nd opinion of a specialist" and "I do not see a reason for MRI or NCS."

Martinez apparently was offended by the referral for a psychological consultation, as he states that the referral for a psychological evaluation caused him to stop requesting medical services.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to Martinez's claims occurred at CTF in Monterey County, which is located within the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v.

5

1 Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

2   Generally, as is the situation with defendants' challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

   A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Because it is verified, plaintiff's complaint will be considered in addition to the materials he filed in opposition to the motion for summary judgment.

   The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. See id. at 631.

## DISCUSSION

A.  Summary Judgment Motion

   Deliberate indifference to a prisoner's serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. See Estelle v. Gamble, 429 U.S. 97, 102-04 (1976). To prove that the response of prison officials to a prisoner's medical needs was constitutionally deficient, the prisoner must establish (1) a serious medical need and (2) deliberate indifference to that need by prison officials. See McGuckin v. Smith, 974

6

F.2d 1050, 1059-60 (9th Cir. 1992). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. See Farmer v. Brennan, 511 U.S. 825, 837, 844 (1994). A mere difference of opinion as to which medically acceptable course of treatment should be followed does not establish deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); see also Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.), cert. denied, 519 U.S. 1029 (1996). Where defendant doctors have chosen one course of action and a plaintiff contends that they should have chosen another course of action, the plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, ... and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health." Id.

The central issue here is whether Martinez has shown the existence of a triable issue of fact that defendants have acted with deliberate indifference. The court concludes that Martinez has failed to meet his burden.

The undisputed evidence shows that Martinez has been treated for his back problems by the defendants. Martinez has been seen by several doctors, who have ordered pain medications and exercises as treatment for his chronic back pain. The doctors have, however, declined to order two tests -- an MRI and nerve conduction studies -- that Martinez wants. The undisputed evidence is that the doctors who have considered the question believe that the diagnostic tests are not necessary under the circumstances.

Martinez has not raised a triable issue of fact that the doctors' refusal to order an MRI or nerve conduction studies amounts to deliberate indifference. He has presented no admissible evidence to demonstrate that he requires an MRI or nerve conduction studies. And he has presented no evidence as to what treatments might follow if the two tests are performed. Martinez is not a medical doctor and offers no evidence to show that he has any training in medicine, so his opinion as to the proper care for his chronic back pain is not sufficient evidence to defeat the summary judgment motion. The only admissible evidence he offers is that Dr. Friederichs was of the opinion that nerve conduction studies should be

7

considered if his symptoms persisted or worsened, although Dr. Friederichs did not believe the studies were needed at the time he saw Martinez in 2003. The undisputed evidence is that the tests were later considered and determined not to be necessary by Dr. Dayalan, Dr. Rosenthal, Dr. Dinh, and Dr. Luca. Although Martinez argues that the "defendants state there is nothing wrong with the Plaintiff," Opposition, p. 2, there is no evidence that any defendant denied Martinez had back pain and Martinez admits that he "has received numerous treatments from the Defendants. These treatments include prescribed medication naprosyn, Motrin, Elavil, and Tylenol. Treatment also included back exercises." Id. at 6. The evidence indicates the doctors consider the MRI and nerve conduction studies unnecessary in light of the symptoms described and physical examinations they have performed. At the very most, the evidence shows a difference of opinion about the appropriate care for Martinez's back problems. As a matter of law, that difference in medical opinion is insufficient to demonstrate deliberate indifference to a serious medical need. See Jackson, 90 F.3d at 332.

Defendants also have presented undisputed evidence that the lumps on Martinez's back are of no clinical significance. The doctors looked at and had various opinions about what the lumps may be (e.g., fat tumors or fibro-lipomas), but Martinez has not shown that any of those possibilities presented a serious medical condition in need of treatment. Martinez's failure to show a triable issue of fact that the lumps presented a serious medical need is fatal to his Eighth Amendment claim to the extent it is based on defendants' failure to do something about the lumps.

Martinez suggests that the inadequacy of the medical care is shown by the difference between the 2000 and 2003 x-ray reports, because the former stated there was mild scoliosis and minimal degenerative disease while the latter did not. The difference between the x-ray reports does not create a triable issue of fact on the deliberate indifference question. None of the defendants was the radiologist who read the 2003 x-ray; if the 2003 x-ray report is incorrect, the incorrectness is not attributable to the defendants. Even if the 2000 x-ray report is correct and the 2003 report is not, Martinez has not provided competent evidence

that an MRI or nerve conduction studies must be done if there is mild scoliosis or minimal degenerative disease. Additionally, the 2000 x-ray report has been available to the doctors at CTF and considered by at least one of them, as shown by the fact that Dr. Aung's notes from April 2, 2003 visit specifically refer to the 2000 x-ray results. Friedman Decl., Exh. A, p. 34.

Martinez has presented printouts from two web sites (i.e., webmd.com and back.com) concerning back care. He has not shown that these printouts are admissible evidence to prove the standard of medical care for a particular condition. See Fed. R. Civ. P. 56(e).[1] Even if the evidence was not inadmissible, the websites do not show that any specific treatment is required for a particular back condition. The websites have general information that appear to show a variety of treatment options for back pain and do not purport to bypass the need for a doctor's professional judgment as to the proper treatment for any particular patient.

Martinez argues that Dr. Friederichs ordered nerve conduction studies and an MRI if his pain persisted. This overstates the evidence. Even Martinez's evidence shows that Dr. Friederichs said that nerve conduction studies should be considered if the pain and symptoms continued. The studies later were considered and rejected. Dr. Friederichs' interrogatory response tells the court nothing because the interrogatory is not included; without knowing what was asked, Dr. Friederichs' response is meaningless.

Martinez also tries to show that defendants are acting contrary to an established plan for treating a patient, relying on Dr. Dayalan's interrogatory response. Dr. Dayalan's interrogatory response does not show a triable issue of fact that prison doctors are not following a required treatment plan. First, it does not appear that the responses belong to the interrogatories in plaintiff's Exhibit D because the interrogatories are dated after the responses. Second, even if the interrogatories and the responses are not mismatched, the interrogatory posed to Dr. Dayalan presupposed ineffective treatment and that has not been shown to exist. See Plaintiff's Opposition, Exh. D, Interrogatory No. 3 ("Explain the policy, directive, instruction, or procedure when a Physician is unable to diagnose, identify, or treat a serious medical condition effectively.") This evidence does not raise a triable issue of fact

9

that the doctors have been deliberately indifferent to the back problems.

When the evidence is viewed in the light most favorable to Martinez, and inferences therefrom drawn in his favor, a reasonable jury could not find deliberate indifference by defendants. It is undisputed that Martinez has received care for his back problems over the last several years at CTF. He has not shown that any reasonable juror could conclude that he received care that was "medically unacceptable under the circumstances" and that defendants chose this course of treatment with a "conscious disregard of an excessive risk" to his health. See Jackson, 90 F.3d at 332. No reasonable jury could return a verdict for Martinez on the evidence properly before the court, even viewing the evidence in the light most favorable to him. Defendants therefore are entitled to judgment as a matter of law.

B.      Miscellaney

Plaintiff's "motion for continuance for further discovery" to permit him to file his opposition to the motion for summary judgment is GRANTED in that the court will deem timely the opposition brief filed on February 5, 2006. (Docket # 11.)

Defendants Dinh and Rosenthal were never served with process because they no longer worked for the prison or the state when service of process was attempted by the U.S. Marshal. See Docket # 7. The deficiencies in Martinez's evidence are the same for the two unserved defendants as it is for the defendants who have moved for summary judgment, i.e., there is no triable issue of fact that any defendant was deliberately indifferent to Martinez's back problems. Therefore the court will enter judgment in favor of defendants Dinh and Rosenthal as well as in favor of the other defendants without stopping to wait for plaintiff to locate the unserved defendants so that process may be served on them before judgment is entered in their favor.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 9.) Because all claims over which the court has original jurisdiction have now been resolved, the court declines to exercise supplemental jurisdiction over the state law claims. See 28 U.S.C. § 1367(c)(3). The state law claims are dismissed. Judgment will be

1 | entered in defendants' favor and against plaintiff on the § 1983 claims. The clerk shall close
2 | the file.
3 |     IT IS SO ORDERED.
4 | DATED: July 19, 2006

Marilyn Hall Patel
United States District Judge

**NOTE**

1.  Even if one surmounted the problem that the evidence is inadmissible, the websites have information that actually undermines Martinez's position. For example, Martinez tries to show defendants' ineptitude by arguing that the prescription of Elavil was unacceptable because Elavil is actually an anti-depressant with bad side effects. The two web sites plaintiff relies on have information suggesting Elavil is an appropriate treatment for chronic pain. The "Webmd.com" site lists Elavil's uses as including treatment of depression but also that "[t]his medication may also be used to treat . . .certain types of pain (e.g., peripheral neuropathy, neuropathic pain)." www.webmd.com/drugs/drug-1807-elavil+oral, visited on July 9, 2006. Dr. Rosenthal, who prescribed the Elavil, had identified Martinez's pain as neuropathic pain. Similarly, the "back.com" website lists antidepressants as among the drugs that may be used to deal with chronic back pain. In listing the treatment options for chronic pain, the medication section states: "Doctors combine other types of drugs with pain relievers. They include anti-inflammatory steroids, anticonvulsants, and antidepresssants. These drugs may be effective treatments for specific types of pain, or pain with specific causes. For example, your doctor may prescribe antidepressants to help relieve certain types of pain. However, it doesn't necessarily mean that you are suffering from depression." See www.back.com/chronic_pain_therapies, visited July 9, 2006. The foregoing is not intended to indicate that one can diagnose illnesses or successfully oppose summary judgment merely by consulting the internet. Rather, it is to show that plaintiff's intended inference -- that prescribing an antidepressant for back pain was absurd – is undermined by the very sources he purports to rely on to show that his back care has been inadequate.

An additional problem exists with the back.com website printout attached as Exhibit A to plaintiff's opposition: it is almost certainly not a true copy of what appears on the website in that it appears to cut off the right side of the page. Text on the right side of the page is missing.